DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**SHOPPING CENTER INTEREST, LLC,**
Appellant/Cross-Appellee,

v.

**TAB 250, LTD., AMERA FEDERAL 300, LTD.,** and **GEORGE RAHAEL,**
Appellees/Cross-Appellants.

No. 4D2024-1066

[April 15, 2026]

Appeal and cross-appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Sandra J. Perlman, Judge, and Mark Alan Speiser, Senior Judge; L.T. Case No. 062014CA003029AXXXCE.

Gaspar Forteza and Anabell Bernot of Forteza Law, PLLC., Miami, and Moises T. Grayson of Blaxberg Grayson, P.A., Miami, for appellant/cross-appellee.

Robert Jeffrey Hauser of Sniffen & Spellman, P.A., West Palm Beach, for appellees/cross-appellants Amera Federal 300, Ltd., and George Rahael.

John Preston Seiler of Law Offices of Seiler, Sautter, Zaden, Rimes & Wahlbrink, Fort Lauderdale, for appellee/cross-appellant TAB 250, Ltd.

FORST, J.

In this dispute concerning usage of six parking spaces, spanning more than twenty years and featuring three trial court judges and a prior appeal to this Court, Appellant/cross-appellee Shopping Center Interest, LLC ("SCI") now appeals the trial court's April 2024 final judgment on damages in favor of Appellees/cross-appellants TAB 250, LTD. ("Tab"), Amera Federal 300, Ltd. ("Amera"), and George Rahael. Appellees cross-appeal the trial court's June 2017 partial summary judgment on liability and May 2020 summary judgment on liability. On the main appeal, we agree with SCI and reverse. On the cross-appeal, we agree with some of Appellees' arguments and, accordingly, affirm in part and reverse in part.

**Background**

## I. The 2004 Offsite Parking Agreement

Rahael is a businessman who is the principal of both Appellee companies, Tab and Amera. In 2004, Tab owned a strip mall in Fort Lauderdale ("the Tab Property"), while Amera owned another property across the street ("the Amera Property"). Because the Tab Property by itself had insufficient parking to conform to the City of Fort Lauderdale's Uniform Land Development Regulations ("ULDR") for commercial use, Rahael and the City executed an Offsite Parking Agreement ("OPA") pursuant to ULDR Section 47-20.18. The City signed the OPA. Rahael signed the OPA on Amera's behalf, while Tab was listed as the "Applicant." The OPA states that "[Tab] hereby consents to this agreement." The OPA did not contain a separate signature line for Tab.

Under the OPA, Amera provided Tab with the use of six parking spaces for tenants' off-street parking. The OPA further provided that if the OPA was breached, all of the Tab Property's occupational licenses would be rescinded, the premises would have to be vacated, and the City could enjoin use of the Tab Property until the parking requirements were again met. Mirroring the ULDR, the OPA stated: "All covenants and restrictions contained in this agreement are, and the same shall be construed as, covenants and restrictions running with the land, and they are to be deemed to bind the successors and assigns of the parties." The OPA was recorded in the Broward County public records. The OPA went unquestioned for approximately nine years.

## II. The 2012-13 Foreclosure Action Against Tab Property

In 2007, Tab entered into a mortgage agreement with a bank. The land which Tab mortgaged to the bank included "[a]ll easements, rights of way or use, rights . . . and appurtenances of any nature whatsoever, in any now or hereafter belonging, relating or pertaining to [the Tab Property]." Tab also attested that it had obtained all necessary permits, licenses, and other approvals necessary for the use, occupancy and operation of Tab Property and the conduct of its business, and that all were in full force and effect and not subject to revocation. Tab further agreed to indemnify the bank and its successors in interest for any and all losses incurred in connection with the Tab Property, the mortgage, or the exercise of any rights or remedies granted to it under the mortgage.

Rahael personally signed a separate Guaranty which made him jointly and severally liable for any losses suffered by the bank in connection with Tab's failure to comply with the mortgage. Both contracts defined "losses" to include litigation costs and attorney's fees.

In 2012, Tab defaulted on the mortgage loan and the bank filed a foreclosure complaint ("the Foreclosure Case") against Tab in Broward County Circuit Court.[1]  The bank assigned its rights to SCI, which became the plaintiff.  The complaint sought to foreclose on the Tab Property (the strip mall) precisely as described in the mortgage, with no express mention of the OPA or the parking spaces.  Amera was not joined as a party to the Foreclosure Case.

In March 2013, SCI moved for summary judgment of foreclosure in the Foreclosure Case and a hearing was set for April 8.  On April 4, Rahael unilaterally executed a "Termination of Off-site Parking Agreement" ("the Termination").  The Termination recites that Amera and Tab had entered into the OPA in 2004, and Amera and Tab "hereby terminate" the OPA because the six parking spaces were no longer required because some of the units on the Tab Property were vacant.  Rahael recorded the Termination in the Broward County public records.  The Termination was not signed by the City of Fort Lauderdale.

Four days after the termination, the Foreclosure Court granted summary final judgment of foreclosure to SCI, which then purchased all the foreclosed title and rights at the foreclosure sale.  This final judgment of foreclosure, which SCI submitted in response to the Foreclosure Court's request for a proposed order, included in its definition of the foreclosed property the following language not present in Tab's deed or the complaint, mortgage, or lis pendens: "Non-Exclusive easement to use 6 parking spaces on" the Tab Property "as defined in, and subject to, that Off-Site Parking Agreement . . . ."

Neither Rahael, Amera, nor Tab appealed the final judgment of foreclosure, sought an amendment of its substance within the 15 days provided by Florida Rule of Civil Procedure 1.530, or sought relief from the judgment based on mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, fraud, misrepresentation, or other misconduct of an adverse party within the one-year period which Florida Rule of Civil Procedure 1.540(b) provides for such motions.

**III. The Underlying Liability Litigation Begins (2014-17)**

---

[1] Three different circuit judges were involved in the proceedings recited in this opinion.  For clarity, they will be called "the Foreclosure Court," "the Liability Court," and "the Damages Court."  The Foreclosure Court oversaw the Foreclosure Case, while the Liability Court and the Damages Court were predecessor and successor judges overseeing the litigation directly underlying this appeal.

3

Following the foreclosure judgment and sale, SCI, as the Tab Property's new owner, learned that Rahael had recorded the Termination. Calling the Termination a "blatant act of spite and malice" to cloud their newly obtained title by making the Tab Property unusable, SCI filed a February 2014 complaint in the Liability Court against Tab, Amera, and Rahael with six counts: (I) Quiet Title; (II) Intentional Interference with Business Relationship; (III) Intentional Slander of Title; (IV) Declaratory Judgment [that the Termination was void and SCI had "legal title to the Easement pursuant to the OPA"]; (V) Indemnification; and (VI) Breach of Guaranty. Appellees responded with a motion to dismiss.

In May 2015, the Liability Court issued an order denying Appellees' motion to dismiss "as to all counts except Count II, which dismissal is without prejudice for [SCI] to amend to aver the names of the tenants or individuals with whom relationships have been interfered along with the manner of interference." *SCI never re-filed Count II or provided the names.* Appellees filed answers and affirmative defenses.

SCI subsequently moved for partial summary judgment as to Count IV only. In June 2017, the Liability Court granted partial summary judgment as to Count IV, declaring the Termination to be null and void due to its noncompliance with the ULDR. This partial judgment did not directly address whether the OPA had created an easement in the first place.

**IV: The Foreclosure Court Corrects the Final Judgment (2017-19)**

In May 2017, Amera returned to the Foreclosure Court and moved under Rule 1.540(b) to vacate the foreclosure judgment as void for failure to join an indispensable party. Amera argued it was an indispensable party because "Amera's property" (the right to use six parking spaces) was transferred in the judgment.

The following year, the Foreclosure Court issued a "corrected final judgment of foreclosure and order of clarification" that denied Amera's motion and ruled the foreclosure judgment was not void. However, the Foreclosure Court corrected the description of the foreclosed property on its own motion to conform to the foreclosure complaint under Rule 1.540(a), *nunc pro tunc.* This corrected final foreclosure judgment no longer expressly described the OPA, only the more generic "all easements" language.

Unsatisfied, Amera appealed to this Court. Amera argued the Foreclosure Court lacked authority to correct the judgment under Rule 1.540(a) because this correction was a substantive, rather than clerical, change. Amera also reiterated its indispensable party argument. We affirmed the "corrected final judgment of foreclosure and order of

4

clarification" without written opinion. *Amera Fed. 300, Ltd. v. Shopping Ctr. Interest LLC*, 264 So. 3d 166 (Fla. 4th DCA 2019) ("*Amera I*").

## V. The Liability Court's Summary Judgment for SCI (2020)

In January 2019, SCI moved the Liability Court for summary judgment on all counts, including the previously dismissed Count II. Appellees filed a written opposition to the motion as well as a motion to dismiss, arguing for the first time that the OPA was never effective or enforceable because Tab did not sign it.

In May 2019, Amera and Rahael filed an amended answer and counterclaim containing four declaratory judgment counts, asserting: (I) the OPA is not an easement (just a license); (II) the OPA is not enforceable because Tab did not sign it; (III) the Certificate of Sale and Certificate of Title from the Foreclosure Case are invalid because the final judgment from which those certificates derived was corrected to omit reference to the OPA easement; and (IV) the OPA was naturally terminated because the City approved SCI's request for a parking reduction, which voided the OPA.

SCI filed an omnibus motion for summary judgment on all its claims and Appellees' counterclaims. Appellees filed written responses. In May 2020, the Liability Court issued its summary judgment, entering judgment for SCI on all claims and counterclaims. The Liability Court also found SCI entitled to costs and legal fees and further ordered that the *amount* of damages and fees would be determined at a future evidentiary hearing.

## VI: Damages Trial and Final Judgment (2022-24)

Nearly two years later, and before a different trial court (the Damages Court), the damages trial began. The Damages Court held the first two days of trial in 2022, and the final day of trial *one year later*.

Appellees spent much of the trial asking the Damages Court to revisit the Liability Court's rulings and find SCI was entitled to zero damages because SCI should not have prevailed on liability. Appellees also argued that SCI should not get damages because the counts in its complaint did not entitle SCI to ordinary damages and SCI had failed to plead entitlement to attorney's fees as special damages with the specificity they claimed Florida law requires.

The Damages Court orally ruled that SCI did not have to plead special attorney's fees damages with more specificity than SCI had. After further discussion, the Damages Court said it would stand by its ruling.

Appellees' request of the Damages Court to revisit and contradict the Liability Court's prior orders was unavailing at trial. The Damages Court stated, "I can't sit here as . . . an appellate court, over what another judge has ruled, and I'm kind of like locked in with respect to prior rulings." SCI presented testimony and evidence about the damages that it claimed and how those amounts related to the work performed, which Appellees contested on both factual and legal grounds.

At the close of SCI's evidence, Appellees moved for a directed verdict of zero damages. Responding to Appellees' argument, the Damages Court said, "you're asking me to basically . . . [r]evisit everything that the two judges did before, and I can't do that. I'm sorry, I'm not doing that." The Damages Court denied Appellees' motion for a directed verdict of zero damages.

The Damages Court did not make rulings at the close of evidence, instead requesting proposed orders from the parties. Appellees emailed their proposed final judgment as to damages, which stated that SCI is entitled to zero damages on all counts and that Appellees are the prevailing parties entitled to attorney's fees on Counts III, IV, V, and VI. Appellees' proposed order also reflected Appellees' argument—thrice rejected by the Damages Court at trial—that the special damages were insufficiently pleaded.

After another long delay (ten months), the Damages Court issued Appellees' proposed order verbatim, failing to remove Appellees' counsel's letterhead from page 1. The only contribution by the Damages Court was a note—originally handwritten, then typed in a subsequent issuance of the judgment—that seemingly contradicted the rest of the text by stating: "However, as [the Liability Court] previously determined [SCI] is the prevailing party and would therefore be entitled to reasonable attorneys' fees."

This appeal and cross-appeal follow.

**Analysis**

**I. SCI's Appeal of the Damages Final Judgment**

"A trial court's adoption of a proposed order verbatim constitutes reversible error where it appears the court did not exercise independent decision-making." *King v. King*, 363 So. 3d 1099, 1100 (Fla. 4th DCA 2023). "[W]e will reverse any judgment entered under circumstances that create an appearance that the judgment does not reflect the judge's independent decision-making." *Id.* at 1101 (quoting *In re T.D. v. Dep't of*

6

*Child. & Fam. Servs.*, 924 So. 2d 827, 831 (Fla. 2d DCA 2005)). The following factors are relevant in reviewing such an order:

> 1)  Is the signed order consistent with or divergent from the verbal rulings of the court?
>
> 2)  How much time has passed since the hearing, and does the judge remember the case?
>
> 3)  Are there irregularities or conflicts in the terms of the order?
>
> 4)  Did the judge participate in the trial?
>
> 5)  Did the judge edit or alter the proposed judgment to conform it to his or her conclusions about the case, or did he or she sign it verbatim?

*Id.* (citation omitted). *See also Perlow v. Berg-Perlow*, 875 So. 2d 383, 390 (Fla. 2004); *Nat'l Loan Acquisitions Co. v. Tabernacle Christian Ctr. Ministries, Inc.*, 402 So. 3d 1028, 1034–36 (Fla. 4th DCA 2024).

Here, all five factors support reversal of the final judgment as to damages. Most crucially, the order includes irreconcilable material conflicts. The original text designates Appellees as the prevailing parties entitled to prevailing party attorney's fees on four counts, while the Damages Court's inserted note at the bottom of the order appears to designate SCI as the prevailing party entitled to fees. The signed order diverges from the Damages Court's oral rulings that it *would not* disturb prior judges' orders, direct a verdict of zero damages, or find that SCI did not plead special damages with sufficient specificity. The signed order further states that *no* evidence of damages was presented, which is not supported by the record. One year had passed between days two and three of the damages trial, and the judge repeatedly expressed that he did not remember the case well. The judge participated in the damages trial, but not in any of the eight years of litigation that preceded the damages trial. The judge signed the order almost verbatim, the only exception being the judge's inserted note. That note did not conform the judgment to his own conclusions, but rather created an inconsistency rendering the order unenforceable.

As the damages' final judgment was "entered under circumstances that create an appearance that the judgment does not reflect the judge's independent decision-making," *King*, 363 So. 3d at 1101, we reverse the final judgment in full and remand for further proceedings consistent with this opinion.

7

**II: Appellees' Cross-Appeal**

Appellees ask us to reverse the Liability Court's summary judgment on liability and determine that the OPA was never enforceable or never properly transferred to SCI.

"The standard of review for orders granting summary judgment is de novo." *McKee v. Crestline Hotels & Resorts, LLC*, 376 So. 3d 758, 762 (Fla. 4th DCA 2024). "In a summary judgment proceeding, 'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" *Id.* at 763 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "A trial court's interpretation of a contract is also reviewed de novo." *Fla. Inv. Grp. 100, LLC v. Lafont*, 271 So. 3d 1, 4 (Fla. 4th DCA 2019). "A trial court's ruling concerning the application of res judicata and collateral estoppel is also reviewed de novo." *Aronowitz v. Home Diagnostics, Inc.*, 174 So. 3d 1062, 1065 (Fla. 4th DCA 2015).

The Liability Court ruled on six claims and four counterclaims. We examine each claim and counterclaim in turn.

**Count I: Quiet Title.** The preponderance of the evidence establishes that the OPA created an easement that burdens the Amera Property and benefits the Tab Property.[2]

"An easement constitutes an interest in land, is subject to the statute of frauds, and runs with the land." *Dupont v. Whiteside*, 721 So. 2d 1259, 1263 (Fla. 5th DCA 1998). "Although an easement is not an estate in land and its creation does not convey title, it is an interest that gives to one other than the owner a right to use the land for some specific purpose." *Am. Quick Sign, Inc. v. Reinhardt*, 899 So. 2d 461, 464 (Fla. 5th DCA 2005). "There are no magical words that one must divine in order to create an express easement. All that is necessary are words showing the intention of the parties to create an easement on a sufficiently identifiable estate." *Id.* at 465. "A license is distinguished from an easement in that a license is merely a personal right to use the property of another for a specific purpose, is not an interest in land and, therefore, may not be assigned or conveyed." *Dotson v. Wolfe,* 391 So. 2d 757, 759 (Fla. 5th DCA 1980).

---

[2] We do not address whether all similar agreements constitute easements as opposed to covenants, licenses, rights of way or use, etc. Our narrow determination respecting this OPA is based on party presentation principles and the record, including res judicata that binds only these parties.

Here, both the OPA and the ULDR indicate that the OPA created an easement giving Tab and the successor owners of the Tab Property (including SCI) the right to use six parking spaces on the Amera Property to park cars. Crucially, the OPA states: "All covenants and restrictions contained in this agreement are, and the same shall be construed as, covenants running with the land, and shall bind the successors and assigns of the parties." *Accord* § 47-20.18(C) Fort Lauderdale, Fla., Code (2004) ("An off-site parking and valet parking agreement . . . shall be considered a restriction running with the land and shall bind the heirs, successors and assigns of said owner."). This clear language of the signatories' intent—to create an interest that runs with the land and binds the parties' successors and assigns—is typical of an easement. This language is inconsistent with intent to create a license, which *cannot* be assigned. *See Dotson*, 391 So. 2d at 759. Moreover, the OPA contains restrictions on Amera's right to sell or dispose of the parking spaces to prevent interference with Tab's use of the spaces, which is consistent with an easement and inconsistent with a license.[3] Thus, we affirm the trial court's summary judgment on Count I.

**Count II: Intentional Interference With Business Relationship.** The trial court erred in granting summary judgment for SCI on this count, as SCI failed to plead sufficient facts to survive even a motion to dismiss. "The elements of tortious interference with a business relationship are: (1) the existence of a business relationship under which the plaintiff has legal rights; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with that relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the business relationship." *N. Am. Van Lines, Inc. v. Ferguson Transp., Inc.*, 639 So. 2d 32, 33 (Fla. 4th DCA 1994). "This cause of action requires 'a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered.'" *Bortell v. White Mountains*

---

[3] Alternatively, preclusion principles compel the conclusion that the OPA created an easement that was transferred to SCI at the foreclosure sale. This is so because a court of competent jurisdiction (the Foreclosure Court) already had issued a valid final judgment which adjudicated this issue, and that judgment became final and absolute when the legal deadlines passed for Appellees to challenge, or seek relief from, its substance. *See Moforis v. Moforis*, 977 So. 2d 786, 788 (Fla. 4th DCA 2008); Fla. R. Civ. P. 1.530(g) ("A motion to alter or amend the judgment shall be served not later than 15 days after the date of filing of the judgment[.]"); Fla. R. Civ. P. 1.540(b) (requiring that a motion to relieve a party from a judgment on the basis of mistake, excusable neglect, fraud, misrepresentation, or other misconduct of an adverse party be filed "not more than 1 year after the judgment, decree, order, or proceeding was entered or taken"); *Zikofsky v. Mktg. 10, Inc.*, 904 So. 2d 520, 523–26 (Fla. 4th DCA 2005).

9

*Ins. Group, Ltd.*, 2 So. 3d 1041, 1048 (Fla. 4th DCA 2009) (quoting *Ethan Allen Inc., v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994)). Thus, a tortious interference claim is legally insufficient and subject to dismissal for failure to state a claim if it does not specify any parties with whom the plaintiff "had an understanding or agreement with which [defendant] interfered[.]" *Id.* "The cause of action cannot be established by proof that the defendant interfered with a relationship between the plaintiff and the public at large . . . ." *Id.* (quoting *Sarkis v. Pafford Oil Co.*, 697 So. 2d 524, 527 (Fla. 1st DCA 1997)).

Here, the Liability Court initially properly dismissed Count II on this basis in 2015 "without prejudice for [SCI] to amend to aver the names of the tenants or individuals with whom relationships have been interfered along with the manner of interference." *SCI never amended its complaint as ordered.* The complaint says only, "[t]he Termination interferes . . . with [SCI's] business relationship with the existing and prospective tenants of the Shopping Center" and "with investors and potential purchasers of the Shopping Center" and claims, "[SCI] has been damaged by [Appellees'] conduct." This bare statement of the legal elements without naming any specific party or agreement damaged does not adequately plead a tortious interference claim. *See id.* While SCI later argued this claim related to Appellees towing cars, that allegation did not appear in the complaint.

The Liability Court got this count right the first time. We reverse the summary judgment on Count II and remand with instructions to dismiss.

**<u>Count III: Intentional Slander of Title.</u>** This count is very similar to Count II and fails for similar reasons. In a slander of title action, the plaintiff must prove the following five elements:

> (1) A falsehood (2) has been published, or communicated to a third person (3) when the defendant-publisher knows or reasonably should know that it will likely result in inducing others not to deal with the plaintiff and (4) in fact, the falsehood does play a material and substantial part in inducing others not to deal with the plaintiff; and (5) special damages are proximately caused as a result of the published falsehood.

*Trigeorgis v. Trigeorgis*, 240 So. 3d 772, 775 (Fla. 4th DCA 2018) (quoting *McAllister v. Breakers Seville Ass'n,* 981 So. 2d 566, 573 (Fla. 4th DCA 2008)).

Here, SCI's complaint entirely failed to plead the fourth element or any facts that would support it. We thus reverse the summary judgment on Count III and remand with instructions to dismiss.

**Count IV: Declaratory Judgment.** As explained by our analysis of Count I, the OPA created an easement that was transferred to SCI at the foreclosure sale. Further, the trial court correctly determined that the Termination was invalid because it was not signed by the City, which both the ULDR and the OPA require to make such a termination effective. We affirm the summary judgment on Count IV.

**Count V: Indemnification.** This count based on the 2007 mortgage's indemnity provisions was pleaded against both Rahael and Tab. However, as the complaint itself recounts, only *Tab* was a party to the mortgage. SCI has not asked any court to pierce the corporate veil and treat Rahael as individually liable for actions taken in his capacity as a corporate officer. As such, Rahael is not a proper defendant to this count. We reverse the summary judgment against Rahael on Count V and remand with instructions to dismiss the claim against Rahael on that count.

With respect to Tab, SCI has a stronger case. In signing the mortgage, Tab attested that it had obtained "all necessary permits, licenses, and other approvals necessary for the use, occupancy and operation of the Property and the conduct of its business, and that all are in full force and effect and not subject to revocation," and that it would indemnify the mortgagee and its assignees or successors (i.e. SCI) for any and all losses incurred in connection with the Tab Property, the mortgage, or the exercise of any rights or remedies granted under the mortgage, including attorney's fees. Tab then executed and recorded the Termination, which would have subjected the City's permit for use, occupancy, and operation of the Tab Property to revocation in violation of the former attestation. Tab took this action before the foreclosure judgment issued, so Tab's arguments about potential merger of the mortgage into the foreclosure judgment are irrelevant to general liability. Thus, Tab is required to indemnify SCI for whatever losses are properly indemnifiable under the contract and the facts of this case.

We affirm the trial court's summary judgment against Tab on Count V. On remand, the trial court shall determine the losses for which Tab is properly liable to SCI under the mortgage's indemnification provisions and in what amount, based on the factual record.

**Count VI: Breach of Guaranty.** We agree with the trial court that Rahael breached his personal guaranty of the mortgage by executing and recording the Termination. The guaranty made him jointly and severally liable for damages, attorney's fees, and costs resulting from Tab's failure

11

to comply with the mortgage's Article 10, without any requirement that SCI mitigate damages or exhaust remedies against Tab first.

We affirm the trial court's summary judgment on Count VI. On remand, the trial court shall determine for which losses Rahael is properly liable to SCI under the guaranty and in what amount, based on the factual record.

**Counterclaim I: "OPA Is Not an Easement."** As explained under "Count I," the OPA created an easement that was transferred to SCI at the foreclosure sale. We affirm the summary judgment for SCI on Counterclaim I.

**Counterclaim II: "OPA Was Never Enforceable."** The OPA lists Tab as the "applicant." Tab's principal, Rahael, signed the OPA on Amera's signature line and recorded the OPA in Broward County's public records. Yet, because the OPA does not have a separate signature line or signature for Tab, Tab asks us to hold that the OPA never truly became effective and was never enforceable. Appellees appear to have advanced this argument for the first time in 2019, fifteen years after the OPA was recorded and several years into the underlying litigation.

If the OPA was never a valid contract, that would imply Tab had run an illegal shopping center for years and Appellees had perpetrated a decade-long fraud on the City of Fort Lauderdale, Broward County, two trial courts, this Court, their own tenants, the bank that signed the mortgage, and the attorneys who filed all their legal documents from 2004 to 2018. This position would also contradict Rahael's 2015 affidavit in opposition to summary judgment, Amera's 2017 motion to stay litigation, Amera's briefs to this Court in *Amera I*, and the Termination itself.

We decline to adopt such an interpretation. "Parties who do not sign a contract 'may be bound by the provisions of the contract, if the evidence supports that they acted as if the provisions of the contract were in force.'" *GMRI, Inc. v. Brautigan*, 392 So. 3d 1098, 1103 (Fla. 1st DCA 2024) (quoting *Sosa v. Shearform Mfg.*, 784 So. 2d 609, 610 (Fla. 5th DCA 2001)); *see also Consol. Res. Healthcare Fund I, Ltd. v. Fenelus*, 853 So. 2d 500, 503–04 (Fla. 4th DCA 2003). We affirm the summary judgment on Counterclaim II.

**Counterclaim III: "Certificate of Title Is Invalid."** The trial court correctly determined it lacked jurisdiction on this issue. However, lack of jurisdiction to adjudicate a claim warrants dismissal, not a judgment for the defendant as to that claim. *See Spicer v. State*, 318 So. 3d 1269, 1271 n.1 (Fla. 2d DCA 2021). Further, this counterclaim is moot because

Foreclosure Court amended the certificate of title to remove the contested language. Thus, we reverse the summary judgment on Counterclaim III and remand with instructions to dismiss.

**Counterclaim IV: "The OPA Was Terminated."** In this counterclaim, Appellees assert the OPA was terminated because the approval of a parking reduction request in 2015 rendered the OPA unnecessary. However, the record does not establish compliance with the OPA's and ULDR's requirements for terminating the OPA. The OPA states, "this agreement shall be voided by the *execution and recording of a subsequent agreement.*" (emphasis added). Similarly, the ULDR allows termination when "[t]he parcel being served by the off-site parking no longer requires the parking as evidenced by a written statement executed by the parties executing the off-site parking agreement and as approved by the department and *a termination of the off-site parking agreement is executed by the department . . . .*" § 47-20.18(A)(1)(c) Fort Lauderdale, Fla., Code (2015) (emphasis added). No record evidence shows that these conditions had occurred at the time summary judgment was entered. Accordingly, we affirm the trial court's summary judgment on Counterclaim IV.

**Conclusion**

For the foregoing reasons, we affirm the trial court's summary judgment on liability as to Counts I, IV, V (as to Tab), and VI, and Counterclaims I, II, and IV. We reverse the summary judgment on liability as to Counts II and III, Count V (as to Rahael), and Counterclaim III and remand with instructions to dismiss those counts. We reverse the trial court's final judgment on damages and remand for further proceedings consistent with this opinion.

*Affirmed in part; reversed in part; and remanded for further proceedings.*

KUNTZ, C.J., and SHEPHERD, J., concur.

\* \* \*

**Not final until disposition of timely-filed motion for rehearing.**

13